# EXHIBIT 1

16SL-CC00623

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

STATE OF MISSOURI            )
                                   ) SS.
COUNTY OF ST. LOUIS     )

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

| | |
|---|---|
| JESSE MALLINGER, Derivatively on Behalf of SUNEDISON, | ) ) ) |
| | ) Cause No. |
| | ) |
| Plaintiff, | ) |
| vs. | ) Division No. |
| | ) |
| AHMAD R. CHATILA,<br>Serve At: 24931 Prospect Ave<br>      Los Altos Hills, CA 94022<br>HOLD SERVICE | ) ) ) ) |
| | ) |
| and | ) |
| | ) ) |
| ANTONIO R. ALVAREZ,<br>Serve At: 27800 Central Dr.<br>      Los Altos Hills, CA 94022<br>HOLD SERVICE | ) ) ) ) |
| | ) |
| and | ) |
| | ) ) |
| CLAYTON C. DALEY, JR.,<br>Serve At: 5980 Crabtree Ln<br>      Cincinnati, OH 45243<br>HOLD SERVICE | ) ) ) ) |
| | ) |
| and | ) |
| | ) |
| [Caption continues on next page] | ) |

**<u>VERIFIED STOCKHOLDER DERIVATIVE PETITION FOR BREACH OF</u>**
**<u>FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS,</u>**
**<u>AND UNJUST ENRICHMENT</u>**

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

EMMANUEL T. HERNANDEZ,                    )
Serve At: 3467 Malibu Terrace             )
         Fremont, CA 94539                )
HOLD SERVICE                              )
                                          )
and                                       )
                                          )
GEORGANNE C. PROCTOR,                     )
Serve At: 3925 Westside Rd.               )
         Healdsburg, CA 95448             )
HOLD SERVICE                              )
                                          )
and                                       )
                                          )
STEVEN V. TESORIERE,                      )
Serve At: 144 W 18th St. Apt. 2E          )
         New York, NY 10011               )
HOLD SERVICE                              )
                                          )
and                                       )
                                          )
JAMES B. WILLIAMS,                        )
Serve At: 27 Silverwood Ct                )
         Orinda, CA 94563                 )
HOLD SERVICE                              )
                                          )
and                                       )
                                          )
RANDY H. ZWIRN,                           )
Serve At: 600 Via Lugano                  )
         Winter Park, FL 32789            )
HOLD SERVICE                              )
                                          )
and                                       )
                                          )
PETER BLACKMORE,                          )
Serve At: 50 Barry Ln.                    )
         Atherton, CA 94027               )
HOLD SERVICE                              )
                                          )
and                                       )
                                          )
[*Caption continues on next page*]        )

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

BRIAN WUEBBELS,                            )
Serve At: 11663 Osanna Ln.                 )
         Highland, IL 62249               )
HOLD SERVICE                               )
                                     )
                Defendants,            )
                                     )
 -and-                                     )
                                     )
SUNEDISON, Inc., a Delaware corporation,   )
Serve Registered Agent:                    )
         C.T. Corporation System          )
         120 South Central Avenue         )
         Clayton, MO 63105                )
                                     )
            Nominal Defendant.           )
                                     )

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

Plaintiff, Jesse Mallinger, by his undersigned counsel, submits this stockholder derivative and class action petition (the "petition") against the defendants named herein. Plaintiff makes his allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by SunEdison, Inc. ("SunEdison" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on SunEdison's website concerning the Company's public statements.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought on behalf of nominal defendant SunEdison against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in millions of dollars in damages to SunEdison's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to millions of dollars in potential liability for violations of state and federal law.

2.      SunEdison's core business is the development and sale of renewable energy from Company-operated solar and wind energy plants to utility companies, typically under long-term contracts. In or around 2014, the Individual Defendants (defined herein) decided to undertake an aggressive growth strategy through new asset acquisitions financed by equity and debt via a subsidiary, known as a "yieldco" (the "yieldco growth strategy" or "growth strategy"). Critically, the sustainability and ultimate success of this growth strategy depended on SunEdison's ability to secure new capital at a favorable price (including through the yieldco).

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

Defendants' strategy was supposed to deliver substantial value on acquisitions and future cash flows and drive substantial growth, but it could only do so if comprehensively and carefully executed.

3.     The Individual Defendants escalated their attempted implementation of the yieldco growth strategy in early 2015.  To shareholders and the investing public, all seemed well as SunEdison's stock climbed nearly 70 percent from January 30, 2015 to July 20, 2015.  However, by July 20, 2015, the Individual Defendants knew or were reckless in not knowing that SunEdison was too overleveraged and lacked the necessary cash flows to sustain the growth strategy or even to consummate previously agreed acquisitions.  Regardless, these defendants caused or allowed the Company to continue to push forward on the strategy.  For example, on July 20, 2015, the Company's Board of Directors agreed to acquire a residential solar company for more than *$2 billion*, even though the acquisition had limited upside that deviated significantly from SunEdison's solar business model.  The Individual Defendants even caused the Company to procure debt on unfavorable terms via so-called "warehouse" vehicles, thereby further establishing the Board's knowledge that strategy execution failure was inevitable (and even imminent).

4.     Despite knowing that SunEdison's yieldco growth strategy had imploded into a financial black hole, from July 20, 2015 to at least November 20, 2015, the Individual Defendants caused or allowed the Company to make (or themselves made) materially false and misleading statements to shareholders.  These improper statements misled shareholders as to SunEdison's ability to execute and deliver value on its previous acquisitions and yieldco growth strategy.

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

5.     The Individual Defendants drove the Company to the brink of illiquidity and insolvency.  This, in turn, forced the Individual Defendants to make substantial cost cuts, including laying off 15 percent of the Company work force and terminating its previously agreed-to acquisitions, as well as effectively abandoning the yieldco growth strategy.  And still, the Individual Defendants continued their campaign of deceit with improper statements concerning SunEdison's subsequent departure from the yieldco growth strategy and the Company's financial wherewithal.  The Individual Defendants designed the improper statements detailed herein to, among other reasons, falsely instill confidence in shareholders as a last-ditch effort to allay what had already become an exodus of shareholders, and to conceal their considerable strategy execution failures.

6.     Ultimately, as a result of the foregoing, SunEdison's market capitalization plummeted more than 90 percent, from approximately $9.87 billion on July 20, 2015, to approximately $893 million on November 20, 2015—a *91 percent decline*.  Further, as a direct result of this unlawful course of conduct, the Company is now the subject of federal securities class action lawsuits filed in the United States District Court for the Eastern District of Missouri on behalf of investors who purchased SunEdison shares.

## THE PARTIES

**Plaintiff**

7.     Plaintiff Jesse Mallinger was a stockholder of SunEdison at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current SunEdison stockholder.

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

**Nominal Defendant**

8.      Nominal defendant SunEdison, Inc. is organized and existing under the laws of the State of Delaware corporation, with principal executive offices located at 13736 Riverport Drive, Maryland Heights, St. Louis County, Missouri.  Its Registered Agent is C.T. Corporation System and they may be served at 120 South Central Avenue, Clayton, St. Louis County, Missouri 63105. The Company develops and sells photovoltaic energy solutions, owns and operates clean power generation assets, and develops, manufactures, and sells silicon wafers to the semiconductor industry.  As of December 31, 2014, SunEdison had approximately 7,260 employees.

**Defendants**

9.      Defendant Ahmad R. Chatila ("Chatila") is SunEdison's President, Chief Executive Officer, and a director, and has been since March 2009.  Defendant Chatila knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal.  He also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so.  The Individual Defendants caused SunEdison to pay Defendant Chatila the following compensation as an officer and director:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2014 | $836,538 | $5,343,000 | $1,521,000 | $6,541 | $7,707,079 |

10.      Defendant Antonio R. Alvarez ("Alvarez") is a SunEdison director and has been since October 2012.  Defendant Alvarez knowingly, recklessly, or with gross negligence made

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

improper statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal.  He also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so.  The Individual Defendants caused SunEdison to pay Defendant Alvarez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $89,093 | $184,500 | $273,593 |

11.    Defendant Clayton C. Daley, Jr. ("Daley") is a SunEdison director and has been since August 2014.  Defendant Daley is also a member of SunEdison's Audit Committee and has been since August 2014.  Daley is considered an Audit Committee Financial Expert within the meaning of Item 407 of Regulation S-K, 17 C.F.R. § 229.407.  Defendant Daley knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal.  He also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so.  The Individual Defendants caused SunEdison to pay Defendant Daley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $70,834 | $153,813 | $224,647 |

12.    Defendant Emmanuel T. Hernandez ("Hernandez") is SunEdison's Chairman of the Board and has been since January 2013, and a director and has been since May 2009. Defendant Hernandez is also a member of SunEdison's Audit Committee and has been since at

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

least December 2013. Hernandez is considered an Audit Committee Financial Expert within the meaning of Item 407 of Regulation S-K, 17 C.F.R. § 229.407. Hernandez was appointed Executive Chairman of the Board on November 20, 2015, to advise and assist Defendant Chatila in his duties as CEO of the Company. Defendant Hernandez knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal. He also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so. The Individual Defendants caused SunEdison to pay Defendant Hernandez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $151,000 | $184,500 | $335,500 |

13.     Defendant Georganne C. Proctor ("Proctor") is a SunEdison director and has been since October 2013. Defendant Proctor is also a member of SunEdison's Audit Committee and has been since October 2013, and Chairman of the Audit Committee and has been since at least December 2014. Proctor is considered an Audit Committee Financial Expert within the meaning of Item 407 of Regulation S-K, 17 C.F.R. § 229.407. Defendant Proctor knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal. She also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so. The Individual Defendants caused SunEdison to pay Defendant Proctor the following compensation as a director:

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $119,311 | $184,500 | $303,811 |

14.     Defendant Steven V. Tesoriere ("Tesoriere") was a SunEdison director from October 2012 through January 19, 2016, when he abruptly resigned without explanation. Defendant Tesoriere was also a member of SunEdison's Audit Committee since at least December 2013.  Defendant Tesoriere knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal.  He also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so.

15.     Defendant James B. Williams ("Williams") is a SunEdison director and has been since 2003.  Defendant Williams knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal.  He also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so.  The Individual Defendants caused SunEdison to pay Defendant Williams the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $104,000 | $184,500 | $288,500 |

16.     Defendant Randy H. Zwirn ("Zwirn") is a SunEdison director and has been since March 2013.  Defendant Zwirn knowingly, recklessly, or with gross negligence made improper

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal.  He also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so.  The Individual Defendants caused SunEdison to pay Defendant Zwirn the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $85,354 | $184,500 | $269,854 |

17.    Defendant Peter Blackmore ("Blackmore") was a SunEdison director from February 2006 to November 20, 2015, when he resigned abruptly and without explanation. Defendant Blackmore knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal.  He also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so.    The Individual Defendants caused SunEdison to pay Defendant Blackmore the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $108,082 | $184,500 | $292,582 |

18.    Defendant Brian Wuebbels ("Wuebbels") is SunEdison's Executive Vice President and Chief Financial Officer and has been since May 2012.  Previously, Defendant Wuebbels has served in various leadership roles within SunEdison, and its predecessor MEMC Electronic Materials since joining the Company in 2007.  Defendant Wuebbels knowingly,

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

recklessly, or with gross negligence made improper statements in the Company's press releases, earnings calls, and public filings concerning the Company's ability to execute on its yieldco growth strategy and financial wherewithal. He also knowingly caused or allowed the Company to continue to attempt to execute the growth strategy even though such execution was financially impracticable and improperly wasted corporate assets in doing so. The Individual Defendants caused SunEdison to pay Defendant Alvarez the following compensation as an officer:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2014 | $466,654 | $1,908,000 | $682,500 | $16,043 | $3,073,197 |

19.     The defendants identified in ¶ 18 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶ 9-17 are referred to herein as the "Director Defendants." The defendants identified in ¶¶ 11-14 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶ 9-18 are referred to herein as the "Individual Defendants."

**Other Persons**

20.     Non-defendant Claire Gogel is a current director of SunEdison. She was appointed to that position on January 27, 2016.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

21.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe SunEdison and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SunEdison in a fair, just, honest, and equitable manner. The Individual

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

Defendants were and are required to act in furtherance of the best interests of SunEdison and not in furtherance of their personal interest or benefit.

22.     To discharge their duties, the officers and directors of SunEdison were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of SunEdison were required to, among other things:

(a)     properly and accurately guide shareholders, investors and analysts as to the true condition of the Company's business, including its ability to execute the yieldco growth strategy;

(b)     ensure the Company complied with its legal and regulatory obligations and requirements, including disseminating truthful and accurate statements to shareholders and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how SunEdison conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

23.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of SunEdison, the

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

24.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to repeatedly make, or by themselves making, improper statements concerning SunEdison's ability to execute and deliver value on its acquisitions and yieldco growth strategy, to engage in improper practices that wasted the Company's assets, and to incur substantial damage.  Likewise, the Individual Defendants breached their fiduciary duty of loyalty by allowing defendants to cause, or by themselves causing, the dissemination of SEC filings and public statements which they knew or were reckless in not knowing contained improper statements and omissions.   In addition, the Individual Defendants breached their fiduciary duties by causing or allowing the Company to continue to pursue the yieldco growth strategy despite knowing that execution was financially infeasible.

25.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of SunEdison, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, SunEdison has expended, and will continue to expend, significant sums of money.

26.     In addition to these duties, under the Company's Audit Committee Charter, in effect since February 7, 2014, the Audit Committee Defendants (defendants Daley, Hernandez, Proctor, and Tesoriere), owed specific duties to SunEdison to assist the Board in overseeing

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

financial statements and related disclosures, including the accuracy of its quarterly financial statements and earnings press releases.

## FACTUAL BACKGROUND

27.     SunEdison's core business is the development and sale of renewable energy from Company-operated solar and wind energy plants to utility companies, typically under long-term contracts.  In or around 2014, the Individual Defendants decided to undertake an aggressive growth strategy by leveraging a financing structure dependent on a "yieldco."

28.     A yieldco is a created by a parent company to generate predictable cash flows by bundling long-term contracted operating assets.  Under the yieldco model, the parent company acquires or builds energy sources and then sells those assets and their long-term power-selling contracts to the yieldco.  The yieldco relies on equity and debt financing to raise capital for these asset purchases.  The contracts then generate ongoing cash that the yieldco distributes to its shareholders in the form of dividend flows (known as "cash available for distribution" or "CAFD"), with resulting tax benefits.  Critically, the yieldco model depends on a consistently strong stock price for the yieldco.  The stable stock price in turn depends on steady earnings (and thus dividend) growth.  To accomplish steady earnings growth, the yieldco must acquire new assets from the parent as earlier portfolio assets approach their contract expirations and the costs of capital associated with the new assets must exceed the cost of new capital.  The funneling of assets from the parent to the yieldco are known as "drop-downs."  The drop-down schedule is critical to the yieldco financing structure.

29.     On May 29, 2014, the Individual Defendants issued a press release announcing the Company's filing of a registration statement with the SEC for a proposed initial public offering ("IPO") of one of its yieldcos, TerraForm Power, Inc. ("TERP").  On July 17, 2014,

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

TERP commenced its IPO, which netted approximately $533.5 million.  TERP used a majority of its IPO earnings to repay outstanding debt.  Upon completion of the IPO, SunEdison retained 95 percent of the voting power in TERP.

30.   In 2014, the Individual Defendants relied on TERP to provide financing for purchases of renewable energy assets.  For example, on November 17, 2014, the Board agreed to purchase the leading independent wind development company, First Wind, for $2.4 billion.  Following its acquisition of First Wind, SunEdison became the overall global leader in renewable energy development.   The First Wind deal closed on January 29, 2015.   The Individual Defendants' November 17, 2014 press release announcing the closing of the deal explained that, "SunEdison shareholders are expected to benefit from increased project development cash flow, asset management revenues, and dividend payments from TerraForm Power.  The transaction also will accelerate the timing and enhance the visibility of SunEdison's receipt of incentive distribution rights ('IDRs') from TerraForm Power, and increase the value of SunEdison's yieldco platform."  TERP increased its guidance.

31.   Following consummation of the First Wind acquisition, the Individual Defendants caused SunEdison to continue to expand its asset portfolio.  Throughout the first half of 2015, including at its Capital Markets Day on February 24, 2015, the Individual Defendants represented that their ongoing strategy would drive substantial growth for SunEdison (and TERP).  Consequently, during the first half of 2015, the Company's stock price climbed nearly 70 percent, from $18.73 at the close of trading on January 30, 2015, to $31.66 at the close of trading on July 20, 2015.

32.   The Individual Defendants expanded the yieldco strategy beyond SunEdison.  On May 7, 2015, they announced the Company's filing of a registration statement for a proposed

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

public offering for its international yieldco, TerraForm Global, Inc.   That same day, the Individual Defendants issued a press release announcing SunEdison's "Acquisition Of Seven Renewable Energy Portfolios And Corporate Platforms In Brazil, China, India, Peru, Chile, South Africa, and Uruguay."   In that press release, Defendant Chatila explained that these acquisitions were only the first stage of the Company's plan to rapidly capitalize on renewable energy opportunities in emerging markets.  Chatila stated:

> As we described in our Capital Markets Day in February, SunEdison intends to act quickly to address the opportunity in emerging markets, where the majority of future global electric power infrastructure investments will be deployed[.]
>
> In aggregate, these seven transactions bolster our emerging markets platform. These acquisitions are the result of an extensive global search for the best development partners in each of our target markets - partners with operating fleets of high quality power plants with long-term contracts with creditworthy counterparties.  Our announcement today is the first stage in our plan to move rapidly to capitalize on the opportunity to provide clean, renewable, cost-efficient power to the fast-growing emerging markets.

33.     Also on May 7, 2015, the Individual Defendants issued a press release reporting SunEdison's financial results for the first quarter of fiscal 2015.  The press release touted the Company's positive execution on its growth strategy.  In particular, Defendant Chatila stated, "[d]uring the first quarter, the team continued our exceptional record of balancing operational execution while accomplishing our strategic initiatives."  The press release also reported that TERP's portfolio had grown 70 percent in the first quarter of 2015, alone.  As a result, TERP again increased its guidance moving forward.  Although not reported in the May 7, 2015 press release, at the end of the first quarter, SunEdison's outstanding debt increased to $9.2 billion and the Company reported net losses and negative cash flow from operations.

34.     On July 6, 2015, the Individual Defendants caused TERP and SunEdison to issue a press release announcing those companies' $2 billion acquisition of a wind portfolio from Invenergy.  SunEdison took on more debt to finance the deal including through a new warehouse

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

facility. A "warehouse facility" or "warehouse vehicle" houses assets for SunEdison until its

yieldcos are able to purchase them. Similar to a yieldco, a warehouse vehicle procures debt and

equity financing to consummate an asset acquisition for SunEdison. However, the costs of

capital associated with warehouse vehicles are much higher. The July 6, 2015 press release,

nonetheless, downplayed the use of a warehouse facility, explaining, in relevant part:

> TerraForm Power intends to acquire net ownership of 460 MW of the wind power
> plants from Invenergy with the remaining 470 MW to be acquired by a new
> warehouse facility, for a combined $2.0 billion in aggregate consideration.
> Average unlevered CAFD of the acquired portfolio is anticipated to be $141
> million annually over the next 10 years, generating a levered cash-on-cash return
> of approximately 8.4 percent.
>
>        \*       \*       \*
>
> Building on the success of TerraForm Private (the first operating asset warehouse
> facility that TerraForm Power and SunEdison created for the Atlantic
> Power assets), the companies anticipate that the remaining 470 MW will be
> acquired by a new warehouse facility to be sponsored by SunEdison and third
> party equity investors, with assets dropping down to TerraForm Power in the
> future. The wind farms intended for the warehouse are expected to generate
> average unlevered CAFD of $70 million annually over the next 10 years.

At the same time, the July 6, 2015 press release represented that execution of the Company's

growth strategy created significant value created for SunEdison shareholders. In particular, the

press release stated, in relevant part:

> "TerraForm Power's acquisition of the Invenergy wind plants leverages the power
> of SunEdison's platform which was enhanced with our acquisition of First Wind
> in January of 2015," said Ahmad Chatila, SunEdison chief executive officer
> and TerraForm Power chairman. "The Invenergy transaction creates significant
> value for our shareholders through the accretion in our TerraForm
> Power ownership and the acceleration of our Incentive Distribution Rights
> (IDRs). Together with TerraForm Power, SunEdison's development platform will
> change how energy is generated, distributed and owned around the world."

In response to the deal, TERP again increased its guidance for 2016.

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

## THE INDIVIDUAL DEFENDANTS CAUSE OR ALLOW IMPROPER STATEMENTS TO ALLAY THE COMPANY'S DOWNWARD SPIRAL

35.     During the second half of 2015, the Individual Defendants caused or allowed SunEdison to make, or themselves made, improper statements that represented that the Company would continue to execute on its plan for growth.  These defendants sought to maintain the Company's stock price through improper statements while the Board continued an acquisition binge that has driven SunEdison to near illiquidity and insolvency.

36.     On July 20, 2015, the Individual Defendants caused SunEdison to issue a press release announcing its acquisition of Vivint Solar.  In the press release, Defendant Chatila stated that that acquisition was a "logical next step" for SunEdison and "create[d] significant value for [its] stockholders."  The press release also represented that SunEdison could afford to finance the acquisition.  In particular, the press release stated:[1]

> **"SunEdison's acquisition of Vivint Solar is a logical next step** in the transformation of our platform after the successful execution of our First Wind acquisition in January 2015," said Ahmad Chatila, SunEdison chief executive officer and TerraForm Power chairman. "We expect **the Vivint Solar transaction to create significant value for our stockholders** through the accretion in our TerraForm Power ownership, the acceleration of our Incentive Distribution Rights and an immediate expansion of our capacity and bandwidth to grow our residential business in the U.S. and globally. As of the fourth quarter of 2015, our organic growth and recent acquisitions will put SunEdison on track to deploy more than 1 gigawatt per quarter."

> "This transaction with SunEdison delivers to Vivint Solar's stockholders excellent value for the business we have built over the last four years," said Greg Butterfield, Vivint Solar's chief executive officer. "**SunEdison and TerraForm Power have built a unique model that recognizes the value of long-term, predictable, contracted cash flows from our residential solar portfolio while providing access to a broad pool of financing at an attractive cost of capital…**"

> \*          \*          \*

> **SunEdison intends to fund the cash portion of the merger consideration primarily from the proceeds of a new $500 million secured debt facility and the**

---

[1]     Emphasis added unless otherwise stated.

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

*completion of the $922 million sale of assets to TerraForm Power.* However, completion of the merger with Vivint Solar is not conditioned on consummation of the new debt facility or of any other third-party financing or the completion of the asset purchase by TerraForm Power. If SunEdison were unable to obtain the funding needed to complete the merger at a time when all other conditions to the merger are satisfied, SunEdison could be liable for breach and be subject to customary remedies, including contract damages.

*To support the merger transaction, SunEdison has entered into a commitment letter with Goldman Sachs Bank USA for a $500 million secured term loan facility* to be provided to a wholly-owned, indirect subsidiary of SunEdison which will hold certain development assets of the expanded SunEdison RSC platform after the merger with Vivint Solar. The funding of the term facility is subject to customary conditions, including the negotiation of definitive documentation and other customary closing conditions.

*TerraForm Power has entered into a debt commitment letter with Goldman Sachs Bank USA for a $960 million unsecured bridge facility.* The funding of the bridge facility is subject to the negotiation of definitive documentation and other customary closing conditions. The TERP Purchase Agreement is not conditioned on TerraForm Power's receipt of the new unsecured bridge facility or any other third-party financing.

37.    Also on July 20, 2015, Defendants Chatila and Wuebbels further discussed the Company's acquisition of Vivint Solar during a conference call with securities analysts.  On the call, Defendants Chatila and Wuebbels overstated the value of the Vivint Acquisition to SunEdison as well as the Company's overall strength, including its performance in the second quarter of fiscal 2015 and its attractiveness to investors.  In particular, Defendant Chatila stated, in relevant part:

> *Today is really an exciting day for us. It is a momentous day. It's a transformative day for the company.* And I'm very glad that Greg is here with us. He's now one of our brothers in this business.
>
> *               *               *
>
> However, *our organic engine has been doing incredibly well.* As you've seen in our Q1 results, we added 85 megawatts a week in PPAs in our backlog, 85 megawatts a week. So a gigawatt a quarter, which is more than what other companies do in a year. *And because of that, we are increasing our view for 2016 by 50%.* So we're going from 2,900 megawatts to 4,350. And starting in Q4

'15, we'll be a gigawatt or more a quarter company. *And '17, I promise you, will be larger than '16.*

* * * *

*So it is my opinion, this deal is around 3 to 4x more valuable on an NPV basis versus First Wind. That's why I'm very excited about it.*

* * * *

However, if you go to Page 10, we are still in the beginning. We are today, as of end of Q1 '15 – and *in few weeks, we'll tell you what happened in Q2 '15, which I'm even very excited about, what we've done in Q2 '15.* We were -- we in total were negotiating 53 gigawatts' worth of deals around the world.  53 gigawatts is equivalent to a U.S. power company in terms of the assets that they own. It shows you that now renewables have entered a time when it's not a toy anymore. It's a real business. *It's a large business that can attract significant amount of investments, especially as investors are trying to divest their fossil fuel investment.*

* * * *

Today, we're announcing Vivint Solar. How do we choose such deals? Number one, we look for cultural alignments because when you do a deal, you don't want it to be a battle…

* * * *

*And today, I tell you that with Vivint Solar, we're tripling our value.*

* * * *

But *the nice thing about Vivint,* while we might look at other acquisitions, but reality, you don't need to, because *every year, you can do high volume because you're serving millions of customers, using a solution where the unit economics makes sense. So because of that, the business is beautiful and growing.*

In response to analyst questions, Defendant Chatila further stated, in relevant part:

And because of that, we're going to pool our resources and improve the cost structure for both sides of the equation. *So we expect actually to plow through 2017 post-ITC with ease.*

* * * *

*I'm very excited about the cash flow generation of the business. We are very confident about this business, from paying down the $500 million nonrecourse facility. Actually, we can do a lot more than that if we wanted to, but we didn't*

- 18 -

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

> *because of the way it works, how we dropped down projects into TerraForm and the cash generation per unit as we dropped it down.*

Similarly, Defendant Wuebbels stated, in relevant part:

> I'm going to talk to you a few minutes about accelerating the value for SunEdison.
>
> *              *              *
>
> If you go to the next page, I'll give you a little bit more detail on how that consideration breaks down. So we're going to pay $16.50 a share for Vivint Solar. *The TERP consideration of buying the 523 megawatts of operating assets at the close will represent $6.29 a share. We're then raising the third-party capital, as I said, which will be paid back on the future cash flows over the next 5 years that the business will generate of $3.45.*
>
> *              *              *
>
> So in our minds, again, *truly a transformative a transaction* with a very unique structure, modeling exactly what we did in First Wind, And as Ahmad said, *we expect the value accretion in this business to be significantly more than that, that we got in the First Wind transaction.*
>
> *              *              *
>
> In doing this, *we feel comfortable raising our guidance* from 2.9 gigawatts as the midpoint in our previous guidance to 4.35 gigawatts next year. *That represents over a 50% increase in megawatts to be delivered in the year of 2016. And as Ahmad mentioned, we only see more upside as we move forward into 2017 and beyond.*
>
> *              *              *
>
> So it's almost a 100x growth in the business in the last 5 years, *tremendous growth and execution in the company.*
>
> *              *              *
>
> At the end of the day, *there's very strong strategic rationale across the board.* This is another platform acquisition, as we have said previously, where the value not only accrues to SunEdison but also accrues to TerraForm and also accrues to the Vivint shareholders today. We're able to unlock value in a unique way vis-à-vis our competition while delivering better-than-average returns for TerraForm shareholders while providing significant GP cash flow back to our SunEdison shareholders.

In response to analyst questions, Defendant Wuebbels further stated, in relevant part:

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

So we see [TERP's] business significantly accelerating, much -- very similar to what they showed in their IPO roadshow when they were IPO-ed just over a year ago. ***So we don't see that changing. If anything, we see it accelerating***, and we see this being very complementary to our own business as well.

38.     By the end of the second quarter of 2015, the Individual Defendants had significantly over-leveraged SunEdison.  At that time, the Company had over $1.5 billion in short-term debt and over $9 billion in long-term debt, which included debt from several recent deals to acquire billions of dollars of new wind and solar assets.  In the second quarter, alone, the Company made a public offering of $750 million in convertible preferred shares.

39.     On July 31, 2015, Terra Global launched its IPO.  Terra Global (and thus SunEdison) were only able to raise $675 million from the IPO—much less than originally planned.

40.     On August 6, 2015, the Individual Defendants caused SunEdison to issue a press release reporting the Company's second quarter results for fiscal 2015.  In the press release, Defendant Chatila continued to misstate the Company's ability to deliver on its acquisition-heavy growth strategy.

> "***During the second quarter, we continued to balance operational execution while meeting our strategic objectives***. On the operations front, our leading organic development engine continues to execute as we exceeded our megawatt (MW) and Retained Cash Available for Distribution (CAFD) guidance, delivering 404 MW and $63 million, respectively," said Ahmad Chatila, SunEdison chief executive officer and TerraForm Power chairman. "In addition, TerraForm Power delivered $65 million of CAFD and continues to create value for shareholders with its leading DPS growth. ***Finally, we have largely completed our platform transformation with the agreement to acquire Vivint Solar, a leader in residential solar, as well as the IPO of our Emerging Markets-focused asset ownership platform, Terraform Global.***"

41.     Also on August 6, 2015, SunEdison filed with the SEC its quarterly report on Form 10-Q for the second quarter of fiscal 2015 (the "2Q 2015 10-Q").  In the 2Q 2015 10-Q, the Individual Defendants represented that the Company continued to execute on a sustainable business strategy that adequately accounted for risk.  Defendants Chatila and Wuebbels signed

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

the 3Q 2015 10-Q and certified its accuracy pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). The 3Q 2015 10-Q stated, in relevant part:

> During the second quarter of 2015, we continued execution of a strategic plan for the ongoing operation of our businesses. *Our business strategy is designed to address the most significant opportunities and risks which we currently face, including*:
>
> - Building our renewable energy project pipeline in order to fuel future global growth in our development business across all platforms.
>
> - Growing our portfolio of owned renewable power generation assets within TerraForm and other future vehicles in order to generate cash available for distribution, a portion of which will subsequently be distributed to common shareholders of TerraForm, as well as, in the future, preferential sponsor only incentive distributions rights to SunEdison.
>
> - *Managing working capital* in consideration of our growth initiatives as well as our desire to retain the majority of the renewable energy projects we develop on our balance sheet (through TerraForm or other future vehicles).
>
> <div align="center">*       *       *</div>
>
> *...We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.* The Global IPO and related private placement transactions and our recently completed warehouse financing structures have also contributed to our capital resources....

The 2Q 2015 10-Q contained additional statements that represented that the Company would be able to consummate its sales and purchase agreement with Latin American Power, including:

> *Latin America Power*
>
> In May 2015, TerraForm Global entered into a sale and purchase agreement with Latin America Power Holding, B.V. ("LAP") to acquire certain operating hydro-electric and wind projects located in Peru with a combined generation capacity of 73 MW. The aggregate consideration paid for this acquisition is expected to be $103 million.
>
> <div align="center">*       *       *</div>

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

On May 7, 2015, we entered into a sale and purchase agreement with LAP to acquire certain operating, backlog and development hydro-electric and wind projects located in Chile and Peru. In future periods, we expect to acquire 46 MW of operating projects in Chile, 204 MW of backlog projects in Chile and 673 MW of development projects in Chile and Peru for maximum aggregate consideration of $482 million which includes potential contingent consideration of up to $137 million. Additionally, subject to certain conditions, we (or TerraForm) will acquire a 19 MW hydro-electric project in Chile and a 185 MW wind project in Chile for aggregate consideration of approximately $195 million upon the completion of each project which is expected in late 2015 and late 2016, respectively.

42.     During SunEdison's earnings call for the second quarter of 2015, also held on August 6, 2015, Defendants Chatila and Wuebbels made further misrepresentations concerning the Company's purported success in executing its growth strategy and its ability to finance the projects undertaken as part of that strategy.  For example, Defendant Wuebbels commented on the "power of the platform [defendants] created[,]" including its ability to withstand changes in interest rates and costs of capital.  As a result, SunEdison increased its guidance for 2016. During the conference call, Defendant Chatila stated, in relevant part:

And our diversified pipeline grew once again, now at 8.1 gigawatts with gross pipeline additions of 1 gigawatt versus last quarter. ***This continued strong growth gives us confidence to set 2016 guidance of 4.22 gigawatts to 4.5 gigawatts, an increase by 50% over our prior outlook of 2.8 gigawatts to 3 gigawatts*** provided at our Capital Markets Day earlier this year.

***In short, our business continues to accelerate and you can see the confidence we have not only in the team's ability to execute***, but in our ongoing shift in the energy market, which shows the continued move towards solar and wind energies and their growing importance around the world.

*           *           *

Not long ago, we announced the acquisition of Vivint Solar, which we expect to close during the fourth quarter.

*           *           *

***With a strong development engine and now two yieldcos, we have a complete coverage wherever renewable energy projects are developed, constructed and owned. Our ability to draw projects into yieldcos create a unique structure to***

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

*generate cash. And we have created significant modes around our business.
Now that the pieces are largely in place, we are focused on execution, driving
margin and enjoying the operating leverage of our increased scale.*

\*       \*       \*

On the last two slides, I want to show you the potential for a yieldco market and
the size that it can become. I provided context on the amount of capital that's
focused on investing in these types of projects. The reason they attract this
amount is due to the great long-term, high-quality and predictable cash flows.

In response to analyst questions, Defendant Chatila further stated:

Number one, in this kind of dislocation the strong gets stronger. *We're a lot more
well-set, better set than other people and you can see from our ability to develop
organically,* having the yieldco that we have, the only international yieldco
around in solar and wind. *So because of that we're very well set.*

Similarly, Defendant Wuebbels stated, in relevant part:

*While Ahmad covered this earlier, I want to reiterate the power of the platform
that we have created.* At the SunEdison development business, we create value by
signing up long-term, high-quality contracted cash flows, which we drop into our
asset ownership vehicles, TerraForm Power and TerraForm Global. These
vehicles provide class leading distributions to the TerraForm Power and
TerraForm Global shareholders, as well as to SunEdison as the sponsor.

\*       \*       \*

In short, our model allows for highly accretive drops for the benefit of TerraForm
Power shareholders that also benefit SunEdison shareholders. *Because of the
robustness of our model, we can withstand moves in interest rates and the cost
of capital changes, while still maintaining the model.*

\*       \*       \*

*In closing, with our recent moves and acquisition of Vivint Solar, SunEdison's
platform transformation is largely complete. Our organic core business has
never been stronger or more robust. The momentum in our business is real and
evident as the business is running at record levels. We remain bullish on the
future prospects as the market leader in the renewable energy space.*

In response to analyst questions, Defendant Wuebbels further represented that financing would

not be a problem. In particular, he stated:

… I believe the breakeven is much sooner than that. I think we've stated it
previously that we expect to be cash breakeven as we get into 2016 for the

- 23 -

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

operating company. And I think what you see is from the page that I showed on Vivint, that doesn't change it, right? ... Because of that we don't see the breakeven point or the point of which we're going to generate cash within SunEdison being any different than what we've said previously, which is as we get into 2016, the operating company for SunEdison will be cash positive.

So all along, you've seen projects get[] financed. And the reason they get financed is because of their underlying cash flows, because what you see is that the debt investors that are underwriting that are looking at it going, okay, do I want to take some corporate risk in the high yield market or do I want to go underwrite an asset that has cash flows, that are investment grade and are 20-year contracted, and it's a no-brainer. I mean, people look at those assets, and go, okay, I'll finance that.

So in market dislocations it's the one area that you continue to see get financed. And so we are seeing, in fact, I would tell you that with the emergence of things like the yieldco, the project finance markets have only gotten better, and we're seeing that, because they want to compete for those assets too. So we're not really seeing any issues, Mahesh.

43.     On August 17, 2015, SunEdison issued a press release announcing that it added another $1 billion warehouse vehicle that it could increase to $2 billion in the future. The press release explained that "[t]he decision to add additional warehouse capacity was completed following an analysis by SunEdison of its financing requirements through 2016 and after exploring alternative debt and equity transactions. SunEdison continues to explore financing alternatives, including upsizing its existing warehouse facilities and adding new warehouse facilities. Completion of the formation of the WSIP Warehouse and the financial close of the related debt facilities are subject to customary conditions and are expected to occur by Oct. 31, 2015."

44.     In late-August and September 2015, the Individual Defendants continued to mislead shareholders regarding the Company's financial wherewithal. As revealed by the *Seeking Alpha* article, "The Case Against SunEdison," dated September 9, 2014, during the first

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

week of September, Defendant Chatila assured investors that the Company would soon resolve
its liquidity issues, stating in part:

> The most important question for investors is when we start generating cash for a
> living. I have said it's at the end of 2016 or early 2017. But we've been signaling
> it's going to be a lot sooner than that, probably early 2016 or late 2015.

45.     By the end of September 2015, the Individual Defendants could no longer conceal
that their growth strategy for SunEdison was entirely unsustainable.  In fact, the Individual
Defendants had drained the Company's working capital while driving it to near illiquidity or
insolvency.  On September 29, 2015, as a result of the Individual Defendants' depletion of
Company cash, the Board approved a plan to drastically restructure SunEdison's business
operations in order to cut costs and gain access to cash (the "restructuring plan").  Under the
restructuring plan, SunEdison would no longer drop assets into its yieldcos (at least for the near
future); rather, it would rely on third-party sales and warehouse vehicles.  Ultimately, under
SunEdison's previous growth strategy, the Individual Defendant unsustainably leveraged the
Company, depleted capital resources, and failed to provide shareholder value as represented
previous public statements by the Company and defendants.  As a result, SunEdison and its
shareholders will not realize the future cash flows previously touted by the Individual
Defendants.

46.     Defendants, however, did not disclose the Board's drastic shift in strategy until
October 5 and 7, 2015.  On October 5, 2015, they caused the Company to file a Form 8-K with
the SEC that reported the Board's approval of the restructuring plan, including layoffs of
15 percent of the Company's workforce, that would cost SunEdison $30 to $40 million between
Q3 2015 through Q1 2016.  Specifically, the Form 8-K reported:

> On September 29, 2015, the Board of Directors (the "Board") of SunEdison, Inc.
> (the "Company") approved management's recommendation to a restructuring
> intended to optimize business operations in alignment with current and future

market opportunities, and accelerate cash flow positive operations. The restructuring provides for a workforce reduction of approximately 15% of the Company's global workforce in response to current and expected market conditions and in order to remove duplicative activities created as a result of merger and acquisition activities and business growth.

In connection with the restructuring, the Company estimates that it will incur total charges of approximately $30 million to $40 million which will be recorded in the third quarter of 2015 and through the first quarter of 2016. These charges primarily consist of severance and other benefits to terminated employees, most of which are expected to be paid out by the end of the fourth quarter of 2016.

47.     The next day, on October 6, 2015, the *Wall Street Journal* published an article entitled "SunEdison Won't Complete $700 Million Buyout of Latin America Power" According to Latin American Power, SunEdison breached its obligations under the deal when it failed to make a required $400 million upfront payment for a roughly $700 million.

48.     On October 7, 2015, Defendants Chatila and Wuebbels hosted a special call with analysts to discuss the Board's restructuring plan.  During that call, Defendants Chatila and Wuebbels provided more reasoning for and details concerning the restructuring plan.  Even then, Defendants Chatila and Wuebbels also continued to overstate the Company's business and financial strength, including its liquidity.  In particular, Defendant Chatila explained, in relevant part:

First, let me say that our business fundamentals remain[] strong. Demand for our project is high and our pipeline and backlog remain diverse and growing. As you have heard us say many times, we believe the best way to maximize value creation is by owning and operating projects, and our YieldCo strategy was developed in order to do just that. We still believe that to be true and the arithmetic supports it. However, YieldCos have been impacted by the turbulence in the energy markets. While we believe the underperformance is driven by technical factors rather a change in the underlying fundamental structure, *we need to adjust our tactics, at least in the short to intermediate term, in order to maximize shareholder value*.

We are going to change our tactics in 2 ways. First, we're going to shift our portfolio approach from one that drops almost all projects into YieldCos to one that is flexible with more balanced distribution to warehouses and third-party sales. SunEdison can satisfy our commitments to our YieldCos and optimize

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

beyond in utilizing this strategy. Both TerraForm Power and TerraForm Global have sufficient projects in their core rights. With warehouses, we still have the option to own the access in the future and retain the ability to maximize future value. And with third-party sales, the market for projects is deep and global. The second thing we're going to do is to adjust the structure of the development company to optimize our cash-generating ability. We will do this by fully leveraging the synergies and new economies of scale we have from our recent acquisitions to accelerate our operational expenses, cost roadmap by 2 years to $0.17 a watt by the second quarter of 2016. Our main focus will be in the United States, Latin America, India and China. These are large, growing economies with favorable policies. We will exit or deemphasize certain countries, for example, the new proposed feed-in tariff policy in U.K. make the residential market uneconomic.

Our team is also taking steps to improve gross margin, driven by significant economies of scale in procurement, construction and operation. While improving gross margin was always important in transforming SunEdison to a GP, now every penny per watt counts when projects are sold to third parties.

And finally, based on market dislocation, *we are reducing our 2016 megawatt guidance by 20%.*

With these 2 broad changes, we will generate cash at the development company level. *The company remains well-capitalized with adequate liquidity, and the new optimized economic engine positions us with cash-generating ability that exceeds the liabilities of the business, including acquisitions and converse.*

<div align="center">*   *   *</div>

*So in summary, we are well-positioned to deliver 2015 and 2016. Our model's flexible and allows us to execute on backlog and pipeline of projects, either by retaining value or selling to third parties. We are taking the right steps to maximize shareholder value creation across our path platform.*

In response to analyst questions, Chatila further stated:

So we intend to, as we said before, to close the [Vivint] deal by year-end. And we have the financing already committed.

<div align="center">*   *   *</div>

...we're really disappointed with the results. We're still committed to Latin America. As I said in my remarks, it's one of the most important markets. *The seller there did not satisfy the condition's precedent to the closing of the share purchase agreement. So instead of trying to fix it, remedying it, we're saying that the agreement is terminated.*

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

Similarly, Defendant Wuebbels stated, in relevant part:

> So now if we flip to Slide 11. In addition to improving our liquidity position, we have also taken this opportunity to review the entire complex and the structure of our operations, as Ahmad mentioned. As we announced via a press release on Monday, we've made the very difficult but necessary decision, given current market conditions, to reduce fixed cost and streamline operations in order to strengthen the company and accelerate our ability to generate positive cash flows in 2016. Our aggressive plan, which has already begun implementation, will provide over $125 million per year on a run-rate basis versus the prior plan we provided to you at the Capital Markets Day.

> \*       \*       \*

> While we have strong demand for our projects, given the market dislocation in the YieldCo space, we are revising our 2016 megawatts to 3.2 gigawatts to 3.5 gigawatts as we -- sorry 3.3 gigawatts to 3.7 gigawatts as we continue to evaluate the market recovery and preserve outside optionality for the future.

> \*       \*       \*

> With that being said, as Ahmad alluded to earlier, we continued to believe that in the value of – we continue to believe in the value of TERP and Global as the best long-term vehicles to drive long-term shareholder value for SunEdison. Given this, we will look to utilize warehouses in the near term to retain optionality to drop projects in the vehicles when the conditions improve as opposed to moving to 100% third-party sales now. Given that current flux in the public yieldco markets, we believe this plan is prudent. However, we will continue to keep a keen watch on the landscape, and as the market conditions evolve, we will further refine the mix with between third party and retained megawatts as appropriate.

> \*       \*       \*

> In conclusion, while the last few months have been challenging in the public markets, we are reminded of the continued strength and fundamentals of this renewable energy space. The market is strong, and we expect to continue to grow at a steady space. Internally, we have made difficult but appropriate actions to optimize the development company. And given the strength of our development engine, we remain well positioned to take advantage of the growing market and continue to remain positive on our future.

In response to analyst questions, Defendant Wuebbels added:

> … I would say is that the core issue is that if the – dropping additional assets and paying additional dividends is not going to get paid for than raising equity at these prices to buy that additional cash flow to pay out those dividends doesn't make sense. And so that's really the key. For me, what we have said is, look, we are

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

recognizing this market dislocation. Clearly, there's a disconnect between the underlying value of these assets and what people are willing to pay for them in the yieldcos. Because clearly, if you look at what people are willing to pay for these assets in other means, it is even less than the yields that are being applied in these yieldcos. So structurally, there's things that just don't make sense, right? Because I can go to somebody else that's going to pay a much lower yield for that. So that's where I scratch my head and say we just need to let the market dislocation happen. People need to build confidence back into the asset class into the vehicles, and there's need to perform and they're going to come back in 4 weeks and do their earnings call and they're going to show how they continue to deliver. I think that's all I can say. And until then, putting pressure on them to raise equity at these prices makes no sense, and it's not in the right interest of the SunEdison shareholders, not in the right interest of the TERP. So our view is *we're going to pivot to third parties for people who are going to pay the value for these assets that we have*, but we're going to provide some of them keep optionality because we are a believer in the long term. But we're not going to sit here and try to change the world right now. *We're going to acknowledge reality, move, monetize and create value for our SunEdison shareholders.*

49.     On October 8, 2015, *SeekingAlpha* released an article entitled, "SunEdison: Is Bankruptcy Possible?". The report noted that SunEdison's cash expenditures are "clearly unsustainable" with the Company burning "around $3.5 billion in the last four quarters[,]" that "SunEdison is over-leveraged" with a debt to equity ratio as high as 26.78.

50.     In addition, after Vivint Solar failed to meet analysts' expectations, analysts questioned the health of that company. For example, Credit Suisse's Patrick Jobin explained that Vivint Solar's results "severely call into question [its] health" and raised concerns about the strength of the assets SunEdison agreed to acquire.

51.     Despite all of the above, the Individual Defendants continued to cause or allow SunEdison to misrepresent, or themselves misrepresented, the Company's reasons for its departure from its yieldco strategy and its ability to finance its previous acquisitions and ongoing operations. For example, on November 10, 2015, they caused SunEdison to issue a press release announcing the Company's financial results for the third quarter of 2015. Specifically, the press release stated, "'In addition, we made the difficult, but necessary decision to optimize our

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

organization in the face of the current market conditions within the yieldco space. These changes will not only set up the business for long-term success, but also should position the development business to generate positive cash flow in mid-2016.'"

52.    A November 17, 2015 *Fool.com* article questioned SunEdison's ability to afford the Vivint and Invenergy acquisitions that it previously agreed to. The article also indicated that SunEdison may be a bankruptcy candidate. In particular, that article stated, in relevant part:

**What SunEdison has to do**

It's becoming clear that SunEdison won't be able to buy **Vivint Solar (NYSE:VSLR)** at its current stock price. The $2.2 billion acquisition was made in part because TerraForm Power would buy $922 million of projects from Vivint Solar at a cash on cash yield of 9.5%. Now that's unlikely to happen. Without that capital, it's unlikely SunEdison could afford the $9.89 per share in cash it's supposed to pay for Vivint.[2]

The $2 billion acquisition of Invenergy is also not likely to happen. The company's project portfolio was bought at a levered cash on cash yield of 8.4%, so there's really nowhere for those assets to go right now.

It's uncertain how these acquisitions will unravel, but I don't see how they get completed at today's prices.

**SunEdison may be a bankruptcy candidate**

With its business model falling apart, SunEdison needs a savior to finance both projects and its future operations. But that's not going to come from hedge funds that are abandoning the company or yieldcos that now have such high yields that they can't buy projects.

The next thing to look at is debt maturities, which could cause the company's bankruptcy. SunEdison's $410 million margin loan that matures on Jan. 29, 2017 will be the first major date to look at. The company could probably make it through 2016 if it doesn't burn too much cash (which is possible) but it will have a hard time refinancing debt if today's market conditions continue.

Unless there's a huge turnaround in SunEdison's stock price and a reduction in debt, I don't see how the company can survive long term.

---

[2]    SunEdison and Vivint have since agreed to amend their agreement and reduce the total price as well as the proportion of cash consideration.

53.     Ultimately, as a result of the foregoing, SunEdison's stock price fell more than 90% from $31.66 on July 20, 2015, to $2.82 on November 20, 2015.

**REASONS WHY DEFENDANTS' STATEMENTS**
**AND OTHER CONDUCT WAS IMPROPER**

54.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     Vivint was not an attractive investment because the expiration of the ITC tax credit in early 2017 significantly limited the company's growth potential and inherent value;[3]

(b)     Vivint was not a logical next step or otherwise a strategic fit for the Company in light of significant differences between Vivint's and SunEdison's business model;

(c)     SunEdison was severely overleveraged;

(d)     SunEdison lacked cash flows to sustain its operations, and as a result, bordered on illiquidity, insolvency, and even bankruptcy;

(e)     SunEdison lacked cash flows to consummate all of the asset acquisitions it agreed to;

(f)     as a result, the Company could not procure financing on favorable terms (especially in light of the ongoing institutional investor exodus) and was limited in its ability to withstand moves in interest rates and changes in cost of capital changes;

---

[3]     Vivint is not an attractive investment because utility scale solar projects will become more expensive when the Federal Investment Tax Credit (ITC) expires in 2016, which means lower profitability on already low margins.  In addition, Vivint follows the third party owned rooftop solar model which is in a death spiral due to growing recognition that it is a bad value proposition for customers. According to the NREL, owned solar panels are much more cost-effective and have a much more profound impact on property value.

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

(g)     as a result, the Company could not procure all financing necessary to execute its growth strategy;

(h)     as a result, the Company could not sustain its growth strategy or the pace of its acquisitions;

(i)     as a result, the Company needed to sell assets to third parties to generate cash flows;

(j)     as a result, the Company could not execute all asset drop-ins for its yieldcos;

(k)     as a result, the Company cannot deliver on its 2016 guidance;

(l)     as a result, the Company cannot deliver full execution of its growth strategy, including delivery of future cash flows;

(m)     as a result, the Company cannot deliver full expected value for its acquisitions; and

(n)     the Board approved the restricting plan because SunEdison lacked sufficient cash flows to continue its previous growth strategy and was otherwise approaching illiquidity, insolvency, and even bankruptcy.

55.     As the Individual Defendants' misconduct has come to light, SunEdison has been hit by a wave of director and departure departures, including involuntary terminations.  On November 20, 2015, Carlos Domenech Zornoza, an Executive Vice President of the Company and the CEO of TERP, was "removed" from both roles and terminated by the Company.  On the same day, Defendant Blackmore resigned abruptly and without explanation as a director, and Defendant Hernandez was appointed as the Company's Executive Chairman of the Board to assist Defendant Chatila.  On January 14, 2016, Francisco "Pancho" Perez Gundin, SunEdison's

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

Executive Vice President and Chief Operating Officer of the Company was "separat[ed]" from the Company.  On January 19, 2016, Defendant Tesoriere resigned abruptly and without explanation.  These unexplained terminations and other departures are suspicious and are indicative of the Individual Defendants' underlying wrongdoing alleged herein.

## DAMAGES TO SUNEDISON

56.     As a result of the Individual Defendants' improprieties, SunEdison disseminated improper, public statements concerning the Company's ability to execute and deliver value on previous acquisitions and its yieldco growth strategy.   These improper statements have devastated SunEdison's credibility as reflected by the Company's almost $9 billion, or 90%, market capitalization loss.

57.     SunEdison's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, SunEdison's current and potential customers consider a company's ability to make full, accurate, and non-misleading public statements, and execute on business strategies and acquisitions, including appropriately accounting for its financial positions.  Businesses are less likely to award contracts to companies that are unable to appropriately account for their financial position, execute on business strategies and acquisitions, or make full, accurate, and non-misleading public statements.  SunEdison's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the Individual Defendants' wrongdoing detailed herein has materially increased the perceived risks of investing in and lending money to the Company.

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

58.     Further, as a direct and proximate result of the Individual Defendants' actions, SunEdison has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)     costs incurred from terminating previously agreed to acquisitions and other agreements;

(c)     costs incurred from abandoning or delaying its yieldco growth strategy; and

(d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to SunEdison.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

59.     Plaintiff brings this action derivatively in the right and for the benefit of SunEdison to redress injuries suffered, and to be suffered, by SunEdison as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   SunEdison is named as a nominal defendant solely in a derivative capacity.   This action is not a collusive one to confer jurisdiction on this Court that it would not otherwise have.

60.     Plaintiff will adequately and fairly represent the interests of SunEdison in enforcing and prosecuting its rights.

61.     Plaintiff was a stockholder of SunEdison at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current SunEdison stockholder.

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

62.     The current Board of SunEdison consists of the following eight persons:
(i) Director Defendants Chatila, Alvarez, Daley, Hernandez, Proctor, Williams, and Zwirn, and
(ii) non-defendant Gogel.  Plaintiff has not made any demand on the present Board to institute
this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

63.     Pre-suit demand on the current Board was not required before bringing these
claims because a substantial majority of the current Board is interested, non-independent, and
incapable of objectively evaluating such a demand.  Among other things, each of the Director
Defendants face a substantial likelihood of liability for breach of fiduciary duties, nor were the
Director Defendants' decisions set forth herein a valid exercise of business judgment.  Demand
on the Board, accordingly, is futile.

**Demand Is Futile because the Director Defendants Face a Substantial Likelihood of
Liability for their Misconduct**

64.     As to the Company's major growth strategy, including its heavy reliance on
equity and debt financing, each of the Director Defendants took a very active role in disclosures
to investors and the public concerning the yieldco growth strategy and subsequent departure
from that strategy.  As a company that depends on its ability to engage in complicated financing
activities, SunEdison is, first and foremost, a company that must be guided by directors who can
capably evaluate and mange financial risk.  As the Board itself conceded in the Company's 2015
Proxy Statement,

> *Risk is an integral part of Board and committee deliberations* throughout the
> year. The Company conducts a formal annual risk assessment as well as
> coordinates on-going risk management activities throughout the year to identify,
> analyze, respond to, monitor and report on risks.  Risks reviewed by the Company
> include *operational risks, financial risks, legal and compliance risks, IT risks
> and strategic risks*.  While it is the job of the Chief Executive Officer and senior
> management to assess and manage the Company's exposure to risk, *the Audit
> Committee provides oversight to the process. The Audit Committee is
> responsible for discussing the Company's major financial risk exposures and
> the steps management has taken to monitor and control such exposures. The*

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

*Audit Committee and the Board annually review an assessment of the primary operational and regulatory risks facing the Company, their relative magnitude and management's plan for mitigating these risks.* In addition, the Board discusses risks related to the Company's business strategy at the annual strategic planning meeting and at other meetings as appropriate.

65.     Accordingly, Director Defendants Chatila, Alvarez, Daley, Hernandez, Proctor, Williams, and Zwirn were responsible for knowingly or recklessly causing or allowing the improper statements detailed herein. In addition, these defendants were responsible for causing or allowing the Company to continue to pursue the yieldco growth strategy and waste corporate assets doing so even after knowing that full execution of that strategy was financially unfeasible. Accordingly, each of the Director Defendants face a substantial likelihood of liability for breach of fiduciary duty and demand upon them is futile.

**Demand Is Futile Because the Director Defendants' Conduct was not a Valid Exercise of Business Judgment**

66.     Director Defendants Chatila, Alvarez, Daley, Hernandez, Proctor, Williams, and Zwirn's challenged misconduct at the heart of this case constitutes a threat to the Company's very survival. As members of SunEdison's Board, the ultimate decision-making body of the Company, each of these defendants affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread improper activities. Causing the Company to engage in the improper tactics that threaten its survival is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment. The Director Defendants constitute seven of eight members of the Board of Directors. Accordingly, demand on the Board is excused.

**Demand is Futile as to the Audit Committee Defendants for Additional Reasons**

67.     The Audit Committee Defendants, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter

provides that it is responsible for accuracy and integrity of the Company's public release of its quarterly financial results, among other responsibilities. The Audit Committee Defendants were therefore responsible for knowingly or recklessly causing or allowing the improper statements made in press releases announcing financial releases and during earnings calls.

68.     Indeed, unlike at many public companies, where only one member of the Audit Committee is required to be an "Audit Committee Financial Expert," at SunEdison, three of four members (Defendants Daley, Hernandez, and Proctor) were such experts. This meant that each of these defendants possessed the following attributes:

> (A) An understanding of generally accepted accounting principles and financial statements;
>
> (B) The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;
>
> (C) Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or experience actively supervising one or more persons engaged in such activities;
>
> (D) An understanding of internal control over financial reporting; and
>
> (E) An understanding of audit committee functions.

229 C.F.R. § 229.407(d)(5)(ii). *See SunEdison's* 2015 Proxy Statement.

69.     Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand is Futile as to Defendants Chatila and Hernandez for Additional Reasons**

14.     In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to defendants Chatila and Hernandez because, when this

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

action was commenced, there was reason to doubt that Chatila and Hernandez were independent directors capable of objectively considering a pre-suit demand.

70.     Specifically, Chatila's principal professional occupation was his employment with SunEdison as its CEO, pursuant to which he was employed full time and received substantial monetary compensation and other benefits.  Thus, Chatila depended for his livelihood on his employment by SunEdison.  In addition, according to the Company's most recent 2015 Proxy Statement, the Board admitted that Chatila was not an independent director.  Thus, Chatila lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

71.     In addition, Defendant Hernandez's adult son is employed by SunEdison as a software quality assurance engineer, receiving nearly $140,000 in compensation in 2014.  Accordingly, Hernandez is conflicted from objectively considering a demand to bring these claims for fear of jeopardizing not only his own position at the Company but that of his son's livelihood.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

72.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

73.     The Individual Defendants owed and owe SunEdison fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe SunEdison the highest obligation of good faith, fair dealing, loyalty, and due care.

74.     The Individual Defendants violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

faith by consciously causing or allowing the Company to engage in the unlawful acts complained of herein.

75.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that they allowed defendants to cause, or themselves caused, the Company to repeatedly make, or themselves made, improper statements in SEC filings, press releases, and earnings calls.  The Officer Defendants also knowingly, recklessly, or with gross negligence caused or allowed the Company to continue to pursue the yieldco growth strategy despite knowing that execution was financially unfeasible. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

76.     The Director Defendants, as directors of the Company, owed SunEdison the highest duty of loyalty.   These defendants breached their duty of loyalty by knowingly or recklessly causing or allowing the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that they allowed defendants to cause, or themselves caused, the Company to repeatedly make, or themselves made, improper statements in SEC filings, press releases, and earnings calls.  The Director Defendants also knowingly, recklessly, or with gross negligence caused or allowed the Company to continue to pursue the yieldco growth strategy despite knowing that execution was financially unfeasible.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

77.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, SunEdison has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

78.     Plaintiff, on behalf of SunEdison, has no adequate remedy at law.

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     As a result of the wrongdoing detailed herein, and by failing to conduct proper supervision, the Individual Defendants have caused SunEdison to waste its assets by: (i) agreeing to then terminating certain acquisitions; (ii) continuing to pursue the yieldco growth strategy despite knowing that it was financially unfeasible then effectively abandoning the yieldco; and by (iii) paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

81.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

82.     Plaintiff, on behalf of SunEdison, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of SunEdison.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to SunEdison.

85.     Plaintiff, as a stockholder and representative of SunEdison, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits,

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

86.     Plaintiff, on behalf of SunEdison, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of SunEdison, demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing SunEdison to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect SunEdison and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.     a proposal to strengthen the Company's controls over financial reporting and guidance;

2.     a proposal to strengthen the Company's controls over procurement capital and financing, including for acquisitions;

3.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

4.      a provision to permit the stockholders of SunEdison to nominate at least three candidates for election to the Board; and

5.      a proposal to strengthen SunEdison's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to assure that plaintiff on behalf of SunEdison has an effective remedy;

D.      Awarding to SunEdison restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

Dated:  February 18, 2016

**LAW OFFICES OF JOSEPH V. NEILL**

_____/s/ Joseph V Neill_____

Joseph V. Neill  #28472
Sean Michael Rapp #64104
5201 Hampton Avenue
St. Louis, Missouri 63109
Telephone: (314) 353-1001
Facsimile: (314) 353-0181
neill5300@aol.com

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

**JOHNSON & WEAVER, LLP**
Michael I. Fistel, Jr. (*pro hac* application to be filed)
michaelf@johnsonandweaver.com
Albert M. Myers (*pro hac* application to be filed)
alm@johnsonandweaver.com
40 Powder Springs Street
Marietta, GA 30064
Telephone: 770-200-3104
Facsimile: 770-200-3101

*Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the Office of the Circuit Court of the County of St. Louis, Missouri this 18th day of February, 2016.

/s/ Joseph V. Neill
Joseph V. Neill  #28472

DocuSign Envelope ID: 6541F30C-A6AB-43A8-A107-AF76FFF3D3E9

Electronically Filed - St Louis County - February 18, 2016 - 01:58 PM

## VERIFICATION

I, Jesse Mallinger, verify that I have reviewed the foregoing Verified Stockholder

Derivative Petition for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust

Enrichment, and that the allegations as to me are true and correct and that the other allegations

upon information and belief are true and correct.

Dated: February 16, 2016

DocuSigned by:

*Jesse Mallinger*

Jesse Mallinger



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>ELLEN LEVY SIWAK | Case Number:  16SL-CC00623 | |
|---|---|---|
| Plaintiff/Petitioner:<br>JESSE MALLINGER<br><div align="right">vs.</div> | Plaintiff's/Petitioner's Attorney/Address<br>JOSEPH V NEILL<br>5201 HAMPTON AVENUE<br>SAINT LOUIS, MO  63109 | **SHERIFF FEE PAID** |
| Defendant/Respondent:<br>AHMAD R CHATILA | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 | |
| Nature of Suit:<br>CC Other Miscellaneous Actions | | (Date File Stamp) |

## Summons in Civil Case

| | |
|---|---|
| The State of Missouri to: | SUNEDISON, INC.<br>**Alias:** |
| 120 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 | SERVE REGISTERED AGENT:<br>C.T.  CORPORATION SYSTEM |



*COURT SEAL OF*

*ST. LOUIS COUNTY*

        You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
        SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.

<u>19-FEB-2016</u>
**Date**

_____ Clerk

**Further Information:**
ALD

---

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
_____ a person of the Defendant's/Respondent's family over the age of 15 years.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
_____ (name) _____(title).

☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____        _____
          Printed Name of Sheriff or Server                              Signature of Sheriff or Server

### Must be sworn before a notary public if not served by an authorized officer:

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____        _____
                                    Date                                          Notary Public

---

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST.  LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.   A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.   Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits.   Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.  An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

OSCA (7-99) SM30  (SMCC) *For Court Use Only:* **Document ID# 16-SMCC-1256**      3      (Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

S1B
3-20

# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

**FILED**

| | |
|---|---|
| Judge or Division:<br>ELLEN LEVY SIWAK | Case Number: 16SL-CC00623 |

FEB 29 2016

JOAN M. GILMER
CIRCUIT CLERK, ST LOUIS COUNTY

| | |
|---|---|
| Plaintiff/Petitioner:<br>JESSE MALLINGER | Plaintiff's/Petitioner's Attorney/Address<br>JOSEPH V NEILL<br>5201 HAMPTON AVENUE<br>SAINT LOUIS, MO 63109 |
| vs. | |
| Defendant/Respondent:<br>AHMAD R CHATILA | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO 63105 |
| Nature of Suit:<br>CC Other Miscellaneous Actions | |

**SHERIFF FEE PAID**

(Date File Stamp)

## Summons in Civil Case

The State of Missouri to: **SUNEDISON, INC.**
**Alias:**

120 SOUTH CENTRAL AVENUE
CLAYTON, MO 63105

SERVE REGISTERED AGENT:
C.T. CORPORATION SYSTEM

*30 CTCOR*

*COURT SEAL OF*



*ST. LOUIS COUNTY*

        You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
        **SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.**

19-FEB-2016
**Date**

_____
Clerk

**Further Information:**
ALD

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within thirty days after the date of issue.
I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other

Served at **LCW - A. CAIRNS**                    **CT CORP.**        FEB 23 2016    (address)
in **St. Louis County**  (County/City of St. Louis), MO, on **FEB 25 2016** (date) at **9A** (time).

_____          _____
Printed Name of Sheriff or Server        Signature of Sheriff or Server

                **Must be sworn before a notary public if not served by an authorized officer:**
*(Seal)*   Subscribed and sworn to before me on _____ (date).

My commission expires: _____          _____
                              Date                              Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $_____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (7-99) SM30 (SMCC) *For Court Use Only*: **Document ID# 16-SMCC-1256**   1   (Civil Procedure Form No. 1, Rules 54.01 – 54.05,
                                                                54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Electronically Filed - St Louis County - March 08, 2016 - 08:30 AM

STATE OF MISSOURI     )
                      ) SS.
COUNTY OF ST. LOUIS )

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

| | | |
|---|---|---|
| JESSE MALLINGER, Derivatively on Behalf of SUNEDISON, | ) ) ) | |
| Plaintiff, | ) ) | Cause No. 16SL-CC00623 |
| VS. | ) ) | CLASS ACTION |
| AHMAD R. CHATILA, et al. | ) ) | Division No. 11 |
| Defendants. | ) ) | |

## MOTION FOR ADMISSION PRO HAC VICE

COME NOW Plaintiff, by and through counsel, and pursuant to Missouri Supreme Court Rule 9.03, request this Court grant Michael I. Fistel, Jr. leave to appear *pro hac vice* as counsel for Plaintiff in the above-captioned matter. In support of his Motion, counsel states as follows:

This Motion is made upon the Affidavit of Michael I. Fistel, Jr. attached hereto and incorporated herein as Exhibit 1. The receipt from the Clerk of the Supreme Court of Missouri, as required by Rule 6.01(m) is attached hereto as

1

Electronically Filed - St Louis County - March 08, 2016 - 08:30 AM

Exhibit 2. Michael I. Fistel, Jr. will be associated with the undersigned attorney in this matter.

<div align="right">

Respectfully submitted,

/s/ Joseph V. Neill
Joseph V. Neill #28472
Attorney for Plaintiffs
5201 Hampton Avenue
St. Louis, Missouri 63109
Phone: (314) 353-1001
Fax:   (314) 353-0181
neill5300@aol.com

</div>

<div align="center">

CERTIFICATE OF SERVICE

</div>

The undersigned hereby certifies that the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the Office of the Circuit Court of the City of St. Louis, Missouri this 8th day of March, 2016.

<div align="right">

/s/ Joseph V. Neill
Joseph V. Neill #28472

</div>

2

Electronically Filed - St Louis County - March 08, 2016 - 08:30 AM

# EXHIBIT 1

Electronically Filed - St Louis County - March 08, 2016 - 08:30 AM

```
STATE OF MISSOURI   )
                    ) SS.
COUNTY OF ST. LOUIS )
```

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

| | | |
|---|---|---|
| JESSE MALLINGER, Derivatively on Behalf of SUNEDISON, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 16SL-CC00623 |
| VS. | ) ) | CLASS ACTION |
| AHMAD R. CHATILA, et al. | ) ) ) ) | Division No. 11 |
| Defendants. | ) | |

DECLARATION OF MICHAEL I. FISTEL, JR.
IN SUPPORT OF MOTION FOR ADMISSION PRO HAC VICE

I, Michael I. Fistel, Jr. of JOHNSON & WEAVER, LLP, declare as follows:

a)   I am a member in good standing of the following Courts: Georgia State Courts; Georgia Supreme Court; Georgia Court of Appeals; District Court of Northern District of Georgia; District Court of Middle District of Georgia; District Court of Colorado; Eleventh Circuit Court of Appeals; Second Circuit Court of Appeals;